# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Rebecca R. Pallmeyer | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 1361 | **DATE** | 3/31/2004 |
| **CASE TITLE** | Allied Products Corp. vs. ITT Industries, Inc., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. ITT and South Bend have a legally cognizable interest in Allied's insurance policies that is not adequately protected under the proposed buy-back transaction. Therefore, for the reasons stated above, the decision of the bankruptcy court is affirmed.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | Document Number |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 6 number of notices | |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 3 1 2004 date docketed | |
| | Notified counsel by telephone. | | | 25 |
| | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 3/31/2004 date mailed notice | |
| ETV | courtroom deputy's initials | | ETV mailing deputy initials | |

In Re:

ALLIED PRODUCTS CORPORATION,

Debtor.

_____

ALLIED PRODUCTS CORPORATION,

Appellant,

v.

ITT INDUSTRIES, INC., et al.,

Appellees.

**DOCKETED**
MAR 3 1 2004

No. 03 C 1361

Judge Rebecca R. Pallmeyer

## MEMORANDUM OPINION AND ORDER

Appellant Allied Products Corp. ("Allied"), debtor in bankruptcy, moved to sell certain of its liability insurance policies back to the carriers who issued them for the general benefit of its estate and to enjoin parties with actual or potential claims under these policies from taking any action against those carriers. Appellees ITT Industries, Inc. ("ITT") and the City of South Bend, Indiana ("South Bend") objected to the proposed transaction on the grounds that it did not adequately protect their interests. The bankruptcy court sustained the objections and denied Allied's motion. For the reasons stated below, the decision of the bankruptcy court is affirmed.

### BACKGROUND

Prior to filing for bankruptcy, Allied, headquartered in Chicago, engaged in manufacturing operations in a number of states. *In re Allied Prods. Corp.*, 288 B.R. 533, 535 (Bankr. N.D. Ill. 2003). In connection with these operations, between 1966 and 1986, Allied purchased general liability insurance policies (collectively, the "Policies") from The Travelers Indemnity Company ("Travelers"), the Insurance Company of North America (succeeded by Century Indemnity Company) ("INA"), and various affiliated entities (collectively, the "Insurers"). *Id.* The Policies

issued from 1971 to 1986 "have some form of a pollution exclusion," although the record does not indicate what form such exclusion takes. (Ex. 8 to Allied's Br., at 2.) All of the Policies dated January 1, 1986 and later are "claims made" policies, meaning that claims must be made against the insured within the policy period to be covered. (Allied Br., at 13.) All of the Policies permit an injured claimant to sue the Insurers directly upon obtaining a final judgment against Allied. *Allied*, 288 B.R. at 537-38.

From April 30, 1968 to October 28, 1976, Allied and one of its former unnamed subsidiaries owned and operated a die casting and manufacturing facility on a parcel of property in Fayetteville, New York (the "New York site"). (ITT Br., at 1-2.) In 1988, through a foreclosure judgment, ITT took possession of the New York site pursuant to its former status as a secured creditor.[1] (*Id.* at 1.) On or about July 11, 1991, ITT filed an action against Allied in the Northern District of New York (the "New York action") asserting various environmental claims relating to the New York site. (*Id.*) On November 12, 1999, Allied filed an action against the Insurers in Illinois state court seeking a declaration that the Insurers have a duty to indemnify Allied for past and future cleanup costs arising from the New York site. (*Id.* at 3.)

On October 2, 2000, Allied filed a voluntary Chapter 11 bankruptcy petition in the bankruptcy court, (Allied Br., at 3-4), at which time an automatic stay on all judicial proceedings against the Allied, including the New York action, went into effect pursuant to 11 U.S.C. § 362. On an unspecified date after October 2, 2000, the bankruptcy court modified the automatic stay to permit ITT to resume the New York action. (ITT Br., at 2.) On March 26, 2001, pursuant to a stipulation and agreement between ITT and Allied (the "Stipulation"), the New York District Court entered judgment in favor of ITT for $3.7 million. (*Id.*) On May 29, 2001, the bankruptcy court granted Allied's motion to approve the Stipulation, giving ITT an unsecured claim for $3.7 million

---

[1] The record does not explain how ITT came to hold a security interest in the New York site, nor does it provide any details regarding this foreclosure judgment.

2

in the estate. (*Id.* at 2-3.)

From approximately 1964 to the mid-1980s, Allied operating a stamping plant in South Bend, and during the period 1985 to 1987, Allied operated a plow works in South Bend (collectively, the "South Bend sites"). (South Bend Br., at 1-2.) After Allied ceased operations at these sites, it leased the properties to unnamed entities. (*Id.*)

On May 17, 2001, the City of South Bend filed a Proof of Claim in the Allied bankruptcy proceedings asserting environmental claims relating to the South Bend sites. (South Bend Br., at 2.) On an unspecified date, Allied decided to abandon the South Bend sites "as burdensome to the bankruptcy estate and of inconsequential value." (Ex. C to Ex. 6 to Allied's Br., at 1.) On January 15, 2002, pursuant to a "Compromise and Settlement Agreement," Allied agreed to sell the sites to South Bend for $10, and South Bend released all claims in connection with the sites except for claims that could be satisfied from applicable insurance proceeds. (*Id.* ¶¶ 4-5.) Allied also agreed,

> and the Court would so order in the settlement order, that the automatic stay would lift [12] months after entry of [a] settlement order [from the bankruptcy court] to allow South Bend to pursue its claims related to its filed proofs of claim, with recovery limited to proceeds from Allied's insurance policies. However, the stay would not lift in the event that a motion has been filed and an order entered approving a settlement with applicable insurance companies within [12] months. In the event all insurance companies have not settled, the stay would be lifted as to the non-settling companies.

(*Id.* ¶ 6.) On March 15, 2002, the bankruptcy court entered an order affirming South Bend's right to object to any proposed settlement between Allied and any of its Insurers. (South Bend Br., at 3; Ex. D to Ex. 6 to Allied's Br.)

On an unspecified date after October 2, 2000, Allied decided to liquidate all of its assets. *Id.* At some point between October 2, 2000 and July 11, 2002, Allied and the Insurers negotiated a proposed "buy-back" agreement. (Proposed Agreement, Ex. B to Ex. 2 to Allied Br.) This proposed agreement was conditioned on the bankruptcy court's entering a final order (not reversed

3

on appeal) (1) approving Allied's proposed sale of the Policies (except for provisions relating to workers' compensation) back to the Insurers who issued them, (2) enjoining "any and all past, present, or future claimants and any other persons from pursuing the Insurers for coverage under the . . . Policies or otherwise relating to Allied," and (3) approving the adequacy of notice to effectuate such injunction. (*Id.* ¶ 10.) Had this condition precedent been met, the proposed agreement would have required Allied, *inter alia*, (1) to release the Insurers from "all past, present and future, known and unknown claims of any type or nature" (except for workers' compensation claims), (2) to release the Insurers "from any and all obligations the Insurers may have pursuant to any written agreements for the defense or partial defense of Allied," including with respect to the New York action, and (3) to dismiss its action against the Insurers in Illinois state court. (*Id.* ¶¶ 1-3.) The Insurers, in turn, were to pay Allied $3.5 million. (*Id.* ¶ 14.) Allied acknowledged that it intended to make these funds available for the general use of its estate, rather than for prospective claimants under the Policies. *Allied*, 288 B.R. at 535.

On July 11, 2002, Allied filed the Motion with the bankruptcy court. *Id.* The bankruptcy court directed that notice of the debtor's motion be given to all potential policy claimants.[2] *Id.* On August 22, 2002, ITT and South Bend filed objections to the proposed transaction. (ITT Br., at 4; South Bend Br., at 4.)

## DISCUSSION

### I.   Jurisdiction and Standard of Review

This court has subject matter jurisdiction over appeals from the bankruptcy court pursuant to 28 U.S.C. § 158(a)(1), which vests the district court with jurisdiction over appeals from "final judgments, orders and decrees" of the bankruptcy court. *In re Kmart Corp.*, 297 B.R. 525, 528 (N.D. Ill. 2003). When reviewing bankruptcy court decisions, the district court acts as an appellate

---

[2]     The record does not indicate when the bankruptcy court issued this order.

4

court. *Bielecki v. Nettleton*, 183 B.R. 143, 145 (N.D. Ill. 1995) (citing FED. R. BANKR. P. 8013). In an appeal from a bankruptcy court's decision, the district court reviews the findings of fact of the bankruptcy court for clear error, and its legal conclusions de novo. *Dye v. United States*, 360 F.3d 744, No. 03-2043, 2004 WL 438317, at *2 (7th Cir. Mar. 10, 2004) (internal citations omitted). The parties in this case raise exclusively questions of law, which this court reviews *de novo*.

The parties agree that the Policies are property of the estate in bankruptcy, under the broad definition of § 541(a) of the Bankruptcy Code, 11 U.S.C. § 541(a), and, accordingly, that the Policies are subject to sale under § 363(b)(1) of the Bankruptcy Code. *Id.* at 535-36. Allied does not challenge the bankruptcy court's determination that, pursuant to 11 U.S.C. § 363(e),[3] "the buy-back arrangement can only be approved if the claim holders have no interest in the . . . [P]olicies." *Allied*, 288 B.R. at 536. Instead, Allied urges that the bankruptcy court erred in finding that ITT and South Bend have protectable interests in the Policies–specifically, their "ultimate right to recover from the issuing carriers" under § 388 of the Illinois Insurance Code, 215 ILCS 5/388[4]–and that the proposed transaction did not provide adequate protection for such interests. *Id.* at 534-35, 537. Allied acknowledges that § 388 "afford[s] injured persons a right of action against the insurer if

---

[3] Section 363(e) provides, in pertinent part, "Notwithstanding any other provision of this section, at any time, on request of an entity that has an interest in property . . . proposed to be . . . sold . . . the court, with or without a hearing, shall prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest."

[4] Section 388 provides, in relevant part,

No policy of insurance against liability . . . shall be issued or delivered in this State . . . unless it contains in substance a provision that the insolvency or bankruptcy of the insured shall not release the company from the payment of damages for . . . loss occasioned during the term of such policy, and stating that in case a certified copy of a judgment against the insured is returned unsatisfied . . ., then an action may be maintained by the injured person . . . against such company under the terms of the policy and subject to all of the conditions thereof for the amount of the judgment in such action not exceeding the amount of the policy.

215 ILCS 5/388.

5

execution against the insured is returned unsatisfied," thereby "confer[ing] an interest in such . . . polic[ies] on every member of the public that is negligently injured." (Allied Reply Br., at 12 (citing *People ex rel. Terry v. Fisher*, 12 Ill.2d 231, 237, 145 N.E.2d 588, 592 (1957)). Allied argues, nevertheless, that any such interests in the Policies are preempted under the Bankruptcy Code. Even if such interests are not preempted, Allied contends, the bankruptcy court should have required ITT and South Bend to prove those interests. This court considers each argument in turn.

II. **Does the Bankruptcy Code Invalidate Claimants' Purported Interests?**

Allied claims that §§ 363(l), 365(e)(1)(A), and 541(c) of the Bankruptcy Code, all of which invalidate contractual provisions conditioned solely upon the insured's bankruptcy, preempt § 388 of the Illinois Insurance Code to the extent that section grants ITT and South Bend interests in the Policies. (Allied Br., at 5.) ITT and South Bend note, in the court's view correctly, that, as Allied did not cite § 363(l) in its briefs to the bankruptcy court, any argument based on that section is waived. *See Ameritech Info. Sys., Inc. v. Bar Code Res., Inc.*, 331 F.3d 571, 574 (7th Cir. 2003) ("Because it is clearly established that a party may not raise an argument for the first time on appeal, we hold that this issue has been waived") (internal citations omitted); *Green v. Mass. Cas. Ins. Co.*, 269 B.R. 782, 792 (N.D. Ill. 2001) ([A]s there is no indication that Green raised these claims in his answer or in any counter-claim in the court below, these claims were raised for the first time on appeal. For this reason, the Court cannot now hear these claims").[5] Allied did cite the other two provisions of the Code in its earlier briefs, and the court will address them in turn. First, under § 365(e)(1)(A), "[n]otwithstanding a provision in an executory contract . . . or in applicable law, an executory contract . . . of the debtor may not be terminated or modified, and any right or obligation under such contract . . . may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract . . . that is conditioned

---

[5] The court notes, nevertheless, that Allied likely would not prevail under § 363(l) for the same reasons that its argument based on §§ 365(e)(1)(A), and 541(c), discussed below, fails.

6

on the insolvency or financial condition of the debtor at any time before the closing of the case."[6]

Similarly, § 541(c) provides,

> [A]n interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law (A) that restricts or conditions transfer of such interest by the debtor; or (B) that is conditioned on the insolvency or financial condition of the debtor . . . and that effects . . . a forfeiture, modification, or termination of the debtor's interest in property.

Allied urges that, "to the extent that § 388 . . . and related provisions of the Policies purport to terminate Allied's exclusive property interests in the Policies by creating derivative interests in favor of creditors with claims against Allied that are allegedly covered by the Policies, they are preempted by" §§ 365(e)(1)(A) and 541(c). (*Id.* at 4-5.) Allied cites no cases holding that either of these provisions preempts § 388 of the Illinois Insurance Code, and this court found no such authority.[7] Nevertheless, ITT and South Bend cite no authority to the contrary.

Our Court of Appeals has stated that § 365(e) "invalidates *ipso facto* or bankruptcy termination clauses which permit one contracting party to terminate or even modify an executory contract . . . in the event of the bankruptcy of the other contracting party." *Lyons Sav. & Loan Ass'n*

---

[6] Allied implicitly argues that the Policies are executory contracts within the meaning of § 365(e)(1)(A), and neither ITT nor South Bend argues otherwise. Thus, the court assumes that the Policies are executory contracts under § 365(e)(1)(A).

[7] Allied notes that the bankruptcy court in *In re Forty-Eight Insulations, Inc.*, 54 B.R. 905 (Bankr. N.D. Ill. 1985), stated, "[t]he defendants . . . contend that Section 378 of the Illinois Insurance Code which allows for direct action against insurers should somehow supercede the Bankruptcy Code. Having found that the insurance policies are property of the debtor's estate, the Court summarily rejects this contention." *Id.* at 909. Assuming *arguendo* that the court intended to cite § 388, the fact that § 388 does not supercede the Bankruptcy Code does not imply that the reverse is true, i.e., that the Bankruptcy Code (specifically, §§ 365(e)(1)(A) and 541(c)) supersedes § 388.

Allied also cites cases in which bankruptcy courts found that other provisions in non-insurance contracts were superseded by §§ 365(e) and 541(c), *inter alia*. *See Matter of Daugherty Constr., Inc.*, 188 B.R. 607, 612-15 (Bankr. D. Neb. 1995) (post-bankruptcy sale of membership interests in limited liability company); *In re Grablowsky*, 180 B.R. 134, 137-38 (Bankr. E.D. Va. 1995) (partnership interest); *Matter of Railway Reorganization Estate, Inc.*, 133 B.R. 578, 582-83 (Bankr. D. Del. 1991) ("springing liens"). As these cases did not involve interests in insurance contracts, however, the court finds these decisions inapposite to this case.

v. Westside Bancorporation, Inc., 828 F.2d 387, 393 n.6 (7th Cir. 1987) (citation omitted). Other courts have found that § 541(c) similarly invalidates such contractual *ipso facto* clauses. See, e.g., Summit Inv. and Dev. Corp. v. Leroux, 69 F.3d 608, 611 (1st Cir. 1995). Section 365(e)(1) was "intended to deal with contractual *ipso facto* clauses, according to which the insolvency of a party automatically terminates the contract or constitutes a material breach." In re S. Pac. Funding Corp., 268 F.3d 712, 715-16 (9th Cir. 2001) (citing H.R. REP. No. 95-595, at 348-49 (1978), reprinted in 1978 U.S.C.C.A.N. 5963, 6304-05 (stating that § 365(e) "invalidates *ipso facto*[] or bankruptcy clauses," which "automatically terminate the contract . . ., or permit the other contracting party to terminate the contract . . ., in the event of bankruptcy")). Both §§ 365 and 541 "invalidate contractual *ipso facto* provisions for the reason that automatic termination of a debtor's contractual rights 'frequently hampers rehabilitation efforts' by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most." Summit, 69 F.3d at 610 (citing S. REP. No. 95-989, at 59 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 5845).

In this court's view, nothing in the language of § 388, or in the clauses of the Policies which § 388 mandates, triggers a forfeiture, modification, or termination of the rights of a debtor upon its involvency or bankruptcy. To the contrary, §388 *maintains* the interests of a bankrupt insured in an insurance contract by preventing an *insurance carrier* from terminating or modifying such rights (and, by extension, the rights of parties whom the insured has injured). Cf. Home Ins. Co. of Ill. v. Hooper, 294 Ill.App.3d 626, 632, 691 N.E.2d 65, 69-70 (1st Dist. 1998) ("The plain language of section 388 makes clear the legislative intent to prevent insurers from using the insured's bankrupt condition and resulting inability to make actual payment to satisfy a judgment or any portion thereof as grounds to avoid payment on a policy".) The court finds, therefore, that §§ 365(e)(1)(A) and 541(c) do not invalidate or preempt ITT's and South Bend's interests in the Policies arising under § 388.

8

## III. Have ITT and South Bend Sufficiently Established Their Interests?

Allied contends that, even if § 388 does grant ITT and South Bend a potential interest in the Policies, the bankruptcy court "should have demanded more proof from [ITT and South Bend] that their claims were actually covered by the Policies and consequently entitled to adequate protection as interests under § 363(e)." (Allied Br., at 11.)[8] First, Allied notes that ITT acknowledged in its objection to the proposed transaction that "the policies issued from 1971 to 1986 have some form of a pollution exclusion." (Ex. 8 to Allied's Br., at 2.) This exclusion, Allied urges, "creat[es] a significant risk that Allied had no coverage for the ITT claim for those years." (Allied Br., at 13.) Allied notes that "[t]he only Policies without any pollution exclusions are those issued by Travelers covering the 1968, 1969, and 1970 policy years." (Id. (citing Ex. 11 to Allied Br., at 14).) Allied adds, "[a]ssuming that ITT were able to overcome Travelers' coverage defenses concerning those Policies, the maximum *pro rata* amount that ITT could obtain would be $434,364," i.e., the policy limits for those three policy years. (Id.)

ITT does not dispute this amount of recovery. Instead, ITT urges that, as Allied itself filed an action against the Insurers in Illinois state court, "Allied believed coverage existed for ITT's claim notwithstanding the Insurers' possible coverage defenses." (ITT Br., at 13-14.) ITT notes that, under Illinois law, "the denial of liability by the garnishee [insurer] does not create a contingency which will prevent garnishment." *Zimek v. Ill. Nat. Cas. Co.*, 370 Ill. 572, 576, 19 N.E.2d 620, 623 (1939). ITT adds that "Allied's contention that there is a 'significant risk' that there may be no coverage for ITT's claim rings hollow." (Id. at 14.)

Allied also contends that South Bend's "unliquidated, contested, contingent claim for environmental cleanup costs" is not covered by the Policies, as "[a]ll of the Policies from January

---

[8] To support this contention, Allied cites § 363(o) which provides: "In any hearing under this section (1) the trustee has the burden of proof on the issue of adequate protection; and (2) the entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest."

9

1, 1986 forward are 'claims made' policies, meaning that claims must be made against the insured within the policy period to be covered." (Allied Br., at 13.) To support this contention, Allied cites a 1995-1996 renewal policy issued by an affiliate of INA that states, "This insurance applies to . . . 'property damage' only if a claim for damage because of the . . . 'property damage' is first made against any insured during the policy period." (Ex. A to Ex. 12 to Allied's Br.) As South Bend filed a Proof of Claim in the Allied bankruptcy proceedings in May 2001, after the expiration of the last Policy subject to the proposed buy-back transaction, Allied claims, South Bend cannot recover against any of the Policies.

South Bend notes that Allied operated the stamping plant from approximately 1964 to the mid-1980s, and that Allied's "direct operations" at the plow works began in 1985. (South Bend Br., at 15.) South Bend claims that it will demonstrate "in the proof of liability claim that such damage occurred as to the stamping plant . . . between 1964 and 1986, and at the . . . [p]low [w]orks in 1985-86." (Id.)[9] South Bend also notes that, when Allied and South Bend entered into their Compromise and Settlement Agreement, South Bend reserved claims that could be satisfied from applicable insurance proceeds and that, pursuant to ¶ 6 of the Compromise and Settlement Agreement, "South Bend agreed to a twelve month stay with respect to action against the insurers in order to give Allied a reasonable period to try to broker an insurance deal acceptable to all." (South Bend Br., at 14 (citing Ex. C to Ex. 6 to Allied's Br. ¶¶ 4-5.).) South Bend claims that, through this provision, Allied "agreed to allow South Bend" an interest in the Policies. (Id.)

Allied points out that the court's order approving the Compromise and Settlement Agreement did not "constitute a finding, conclusion or other determination regarding . . . South Bend's entitlement, if any, to the proceeds of any Allied insurance policy . . . ." (Ex. D to Ex. 6 to

---

[9] South Bend also argues that, even though it did not assert its claims until May 2001, coverage "turns on whether the 1986 and later insurers first learned of environmental problems at Allied's South Bend properties requiring an cleanup, which almost certainly occurred earlier (Allied does not disclose when)." (Id. at 15 n.11.) Allied cites no support for this contention, however.

Allied's Br. ¶ 10(iii).) The order also stated that "Allied's official committee of unsecured creditors . . . does not oppose this court's approval of the . . . Agreement, provided its approval does not interfere with or impede ongoing settlement negotiations with certain of Allied's insurers." (*Id.* ¶ J.) According to Allied, these provisions demonstrate that, "[n]otwithstanding South Bend's allegation to the contrary . . ., Allied never agreed to allow South Bend an interest in the Policies." (Allied Reply Br., at 8.)

ITT and South Bend also claim that, under Illinois law, they have "legally protect[a]ble interest[s]" in the Policies stemming from the moment the damage to the properties occurred. (ITT Br., at 14; South Bend Br., at 14.) Allied contends that "[n]either the Policies nor Illinois law create an enforceable property interest in the Policies for the benefit of anyone other than Allied and its bankruptcy estate." (Allied Br., at 4.) In Illinois, Allied notes, "public policy prohibits direct actions against insurance companies" and "bars questions of insurance coverage from even being raised in a trial of the underlying accident liability." *Rockford Mut. Ins. Co. v. Amerisure Ins. Co.*, 925 F.2d 193, 196 (7th Cir. 1991); *see also Zegar v. Sears Roebuck & Co.*, 211 Ill.App.3d 1025, 1027, 570 N.E.2d 1176, 1177 (1st Dist. 1991) ("In Illinois, direct actions against insurance companies are against public policy. . . . to prevent the jury in the personal injury action from becoming aware that the defendant tort-feasor is insured and thereby possibly awarding a larger verdict under the 'deep pockets' theory"); *Scroggins v. Allstate Ins. Co.*, 74 Ill.App.3d 1027, 1031, 393 N.E.2d 718, 721 (1st Dist. 1979) ("[B]ecause the duty [to exercise good faith or due care] is intended to benefit the insured and not third parties, actions by injured claimants founded on third party beneficiary principles have not been permitted"). Allied also notes that one Illinois court stated that "the coverage provisions of an insurance policy are primarily for the benefit of the contracting parties and only incidentally for injured claimants." *Zegar*, 211 Ill.App.3d at 1031, 570 N.E.2d at 1179.[10]

---

[10] Allied also cites *In re Minoco Group of Cos., Ltd.*, 799 F.2d 517 (9th Cir. 1986), in
(continued...)

11

On the other hand, ITT points out that, under Illinois law, "[g]enerally speaking, an insurer and its insured cannot agree to policy interpretations with the intent to keep an injured party from recovering under that policy." *Skidmore v. Throgmorton*, 323 Ill.App.3d 417, 420, 751 N.E.2d 637, 640 (5th Dist. 2001) (citation omitted). "The injured party's relationship with the liability insurer has been . . . characterized as that of a beneficiary[;] the public policy consideration at work in such situations is that liability insurance policies should operate to afford injured parties coverage." *Id.* at 421, 751 N.E.2d at 641 (internal citations omitted). Further, "even though an injured party is not a party to the insurance contract, he or she will always be allowed to file a declaratory judgment action in order to determine the liable party's coverage pursuant to that insurance contract." *Id.* at 422, 751 N.E.2d at 641 (citation omitted). "The injured party's rights come into existence at the moment of the accident." *Id.* (citation omitted). What's more, "injured members of the general public are beneficiaries of liability insurance policies . . . that their rights under the policies vest at the time of the occurrence giving rise to their injuries. . . . [and] that an injured party is considered a real party in interest to an insurance contract. . . ." *Barney v. Unity Paving*, 266 Ill.App.3d 13, 23, 639 N.E.2d 592, 598-99 (1st Dist. 1994) (internal quotation marks and citations omitted). An injured party "must be given at least one opportunity to litigate the question of a tortfeasor's coverage under a liability insurance policy before the injured party's interest in the insurance can be terminated." *Pratt v. Protective Ins. Co.*, 250 Ill.App.3d 612, 618, 620, 621 N.E.2d 187, 191, 193 (1st Dist. 1993) (citations omitted).

---

[10](...continued)
which the court stated that "Liability policies . . . are not held in constructive trust by the insured for the benefit of potential claimants; they are held by the insured as protection against claims that may be asserted against the insured." *Id.* at 519. In addition, Allied cites *In re Dow Corning Corp.*, 198 B.R. 214 (Bankr. E.D. Mich. 1996), in which the court found that, under Michigan law, "prior to obtaining and enforcing a judgment, an injured person merely has an expectation of recovery that is contingent upon the occurrence of future events, and such expectation does not rise to the level of a vested property right." As these cases did not construe Illinois law, however, the court finds them inapposite to this case.

In the context of standing to bring a claim under Article III, our Court of Appeals has stated that "the victim of an insured's tort, even though he is not a third-party beneficiary of his injurer's insurance policy, has a legally protectable interest in that policy before he has reduced his tort claim to judgment (but only after he has been injured)." *Bankers Trust Co. v. Old Republic Ins. Co.*, 959 F.2d 677, 682 (7th Cir. 1992). The court stated that "[t]his conclusion is not inconsistent with the refusal of most states to permit the victim of an insured injurer to sue the injurer's liability insurer directly," which is designed "to protect the insurance company from the hostility of juries." *Id.* (citing *Zegar*, 211 Ill.App.3d at 1031, 570 N.E.2d at 1179).

In the court's view, the weight of authority in Illinois favors the proposition that injured parties do generally have rights in insurance policies, and that such rights vest at the moment of injury. As discussed earlier, both ITT and South Bend own property that was formerly owned (and allegedly contaminated by) Allied. Under Illinois law, therefore, they are considered beneficiaries with vested rights under the Policies, irrespective of the date on which Allied filed its bankruptcy petition. ITT has obtained a judgment against Allied pursuant to a stipulation and agreement between them worth at least $434,364, and South Bend has filed a Proof of Claim in the Allied bankruptcy proceedings asserting environmental claims against Allied covering at least a twenty-year period.

Significantly, even if Illinois law does not grant ITT and South Bend rights in the Policies, the court concludes that, to the extent the claims of ITT and South Bend are covered by those Policies, the Policies themselves grant such rights. As the bankruptcy court found, a clause in one of the Policies provides, "We will pay the insured for the 'ultimate net loss' . . . that the insured becomes legally obligated to pay as damages . . ." and further provides that "[a] person or organization may sue us to recover on . . . a final judgment against an insured." *Allied*, 288 B.R. at 537-38. The other relevant Policies provide that the insurance carrier will "pay on behalf of the Assured . . . all sums which the Assured shall be obligated to pay" for covered liabilities. *Id.* at 538.

13

Allied does not dispute that these clauses purport to give injured or potentially injured claimants an interest in the Policies. The bankruptcy court did not err in finding that ITT and South Bend had "an ultimate right to recover" under in the Policies, and that such interests were not adequately protected by the proposed buy-back transaction. *Allied*, 288 B.R. at 535.

## CONCLUSION

ITT and South Bend have a legally cognizable interest in Allied's insurance policies that is not adequately protected under the proposed buy-back transaction. Therefore, for the reasons stated above, the decision of the bankruptcy court is affirmed.

ENTER:

Dated: March 31, 2004

REBECCA R. PALLMEYER
United States District Judge